My name is Dave O'Brien, and I represent Sahr Saidu, who was wrongfully charged with rape by a Des Moines criminal police investigator, the defendant in this case, Mitchell. I want to give you a little background, because there are only a handful of lawyers in the case, and we're also actually in a kind of a breaking area of law, because the Iowa Supreme Court has recently affirmed that we have private rights of action under the Iowa Constitution, which the Iowa Constitution is Section 1 of our Constitution, and it sets out 25 very specific due process rights that Iowans have. We now have private rights of action under that, as set out in the Godfrey case, and we have several cases going up and back and forth in the Iowa Supreme Court that are setting out the parameters of that, and that's going to come into play in this case. But the reason that there are not that many lawyers in the state of Iowa that do these kinds of work, and I do believe I'm the only lawyer that specializes exclusively in this area in the entire state, is because we have really good law enforcement officers in the state of Iowa. People ask me all the time, you know, you file lawsuits against police, you must not like them. And I say, wait, whoa, whoa, whoa. I started doing this work about 15 years ago, and I am more impressed with the law enforcement officers, 90% of whom are out there all day, every day, doing a very difficult job, at times very dangerous, and they're not violating people's civil rights. And the problem is, we give these officers a rule book, and we say, go out and enforce that against the rest of us, but there is a caveat. You've got a rule book you've got to follow too. And that rule book starts with the Bill of Rights, and it starts with Article 1, Section 8, in this case, of the Iowa Constitution. You cannot bring charges against people without legitimate, probable cause to do so. And so I'm proud of the role that I play in this process to make sure that when officers do overstep their bounds, that we hold them accountable for that wrongful conduct. And that's what's happened in this place. I would like to point out something that I didn't make clear in my briefing and upon rereading, that the warrants filed in this case actually do have a material misrepresentation. If you look at the appendix, page 42 and 44, which set out the actual warrants for arrests that were issued, there are two things in there that, in each case, there's a section for general probable cause, and it says, near the scene of the crime, which was true, Mr. Saidu was present. Then the last one, identified by a witness, which is true, that the complaining witness certainly identified him. But the third one was other physical evidence. Well, if you read other physical evidence as physical evidence that was exclusively in the control of the complaining witness, then that may be true. But I don't think that's the implication of what is being said in this affidavit. Was that brought up before the district court in some sort of Frank's hearing? Well, we didn't have any oral argument in the district court. I made the argument I'm about to make. I didn't point out specifically this other physical evidence factor because I didn't focus on that. The argument I did make is that there was no other physical evidence in this case that independently corroborated this witness's particular testimony. Now, if you look at this case, this has got to be a prosecutor's nightmare. This has got to be the worst possible complaining witness you could think of. I mean, she is a dependent adult living in a group home because of a mental disability. She is schizophrenic. She hears voices. She has problems telling the truth. She has a history of mendacity. She has a history of manipulating people. She has a history of being difficult to deal with. She has a history of being sexually aggressive. Being hypersexual is the term I believe that the medical folks use now. She would escape this group home at least a couple times a month and engage in sexual relations with people that she met online. She is the one that bought the condoms that were used in this case, and the record is clear. So is your argument more that ... You're probably arguing both Fourth Amendment and Iowa Constitution here, right? Correct. Different standards which we can get to. But is your argument that overall there's just insufficient information to issue this warrant or are you suggesting that it's one of those cases where the officer should have done more before taking action given the three month time period? Is your argument in one of those two baskets or is it both? I think it's both, Judge. You clearly have a complaining witness and there is some case law which I cited in my If you have a complaining witness where you know this person, you have reason to believe they're a reliable witness where that alone can establish probable cause. There are limited times where that can happen. This is not one of those cases. This is not a witness that was known to them, and for reasons I already set out, this was not a very reliable witness from the get-go, which everything which this officer should have known. He went to the group home. He knew she was a dependent adult. He knew she had all these problems. That's why she's there. But you have more than that here. Not only do you have the complaining witness, but you have some corroboration, and you have corroboration in the form of her telling, somewhat contemporaneously, somebody, an employee within the group home about the assault, which is corroborating in cases. And then you have the condom, and I think, wasn't there a used condom that was found within the room or was it just an open package or something like that? And that would at least, why doesn't that get you over the probable cause hump? I mean, it's higher than reasonable suspicion, but it's not a huge mountain to overcome. Well, it doesn't get you over that hump because, and to answer your question, she claimed that the condom itself was flushed down the toilet. The wrapper was still there, and she had control of it. But the reason those don't establish independent cause is because they're all exclusive in her control. I mean, she calls up her mother, crying and upset, saying that I had sex with SARS-I-Do. Her mother calls the staff. They come down. She's distraught. She's describing all this thing, which, first of all, think about that. Here's a person who's hypersexual, escapes to do exactly what she did in this case, have sexual relations with people. She buys the condom. The record is clear. He didn't know she bought condoms. She has the receipt. She has the box of condoms. She has the wrapper. There's nothing about this that independently corroborates her story. Isn't that true, though, with most sexual assault-type cases where the victim, I mean, most of the evidence comes from the victim, and it's within the control of the victim? That may be true, Judge, but as you look at this case, a reasonable officer would look at this case and say, because of her history and the problems I've already identified, I need to look carefully at what she did. Number one, perhaps it would be a good idea, I interviewed her four days afterwards. I should go talk to the police officer that interviewed her the first day. Well, it's not in that police officer's report, but when his deposition was taken in the underlying matter, he conceded that when she was reporting the rape to him, she was laughing and giggling about it. So doors open. You have to follow them. She, at one point in time, she didn't say this in early. She gave three different statements. They were all wildly inconsistent in terms of the details. She said we didn't have oral sex, then we did. She said the sex occurred in my bedroom, then it occurred in her roommate's bedroom. She said there were no boxes on the bed, but we have the evidence showing the bed of the roommate was filled with boxes. Does this argument really go, you've got a different chance of success under Iowa versus federal, don't you think? I mean, post-Baldwin? Do we have anything else post-Baldwin from the Iowa courts that are helping us on that? We've got Baldwin II, but I don't think it directly addresses the issues involved in this case. And then there's a Venicus decision, which is also on the Iowa Constitution, but I don't think it's directly applicable. It had to do with prosecutorial immunity. So what are we applying? There is a different standard. So what, in your words, what is the standard that we apply now under the Iowa Constitution? According to Baldwin, it's reasonableness. It's negligence. It's a negligence standard. That's what Baldwin says. We, which, by the way, I would invite you all to adopt that as the new federal standard, if you wouldn't mind. But that's what the Iowa standard is, reasonableness. The Baldwin decision came out after briefing was done in this case. In my brief, because the defendants, remember, never even made a motion for summary judgment on the state constitutional claims. And in my brief- Did you expressly ask, I noticed in your brief you say that maybe you could hold this. Was that ever discussed at the district court, like, hey, maybe we should see what this case says, give us a chance to brief it? I said that right in my brief. I said, look, they didn't make this argument. If you're going to address it, then maybe you want to do certified questions. Maybe you wait until Baldwin's decision is done. Or maybe we have additional argument with briefs because we haven't addressed it substantively. And the judge never responded. We never had an oral argument on the summary judgment. They just threw us out. So what standard do you think the district court applied to the Iowa claim? Well, he clearly applied a recklessness standard. That's what he said. Now, he made some inferences. He actually, in his report on page 11, in his motion for summary judgment on page 11, he admits that there's negligence in this case, twice. But he said that doesn't reach recklessness, which under the Iowa standard is clearly wrong. I think it's wrong under the federal standard. I've got an objectively reasonable officer under the Fourth Amendment. Do you know why the district court chose that standard? Because there was some prior case law under either criminal code section or under the Iowa Tort Claims Act for a wrongful arrest that used that language. But that's clearly been abrogated by the Godfrey-Baldwin standard that we now have this enforced right under Article 8, Section 1 of the Iowa Constitution, and we're going to apply a reasonableness standard to it. Which, by the way, I don't have a problem with that at all. Let me tell you my biggest problem with your case is the fact that in most of these cases, we're talking about a warrantless arrest. Here you talk about what the officer should have known, but what you really have to prove, it seems to me, is the officer goes to the county attorney and says, is this enough, and what's the proper charge? The county attorney actually prepares the warrant affidavit, as I understand it. The warrant application, not the affidavit. The undeligible duty judge, he signed it. He signed the affidavit, he didn't sign the application, though. That's right. He signed the factual basis for it. So the county attorney prepares the application, takes it to a judge, the judge says, yes, this is probable cause, I'm going to issue the warrant. So what you have to prove is that a reasonable officer would know that the county attorney and the judge were so wrong that he shouldn't execute that warrant. We don't even get there because the county attorney and the judge don't know all these facts we've talked about. They don't know she's schizophrenic. They don't know she's living, they know she's a dependent adult. They don't know that there's no corroborating evidence. They don't know that there was a cell phone that she alleges Seydoux took but was never checked for fingerprints. The way people use their cell phones today, if he took it for two hours like she said he did, there would be a two hour gap where there'd be no usage. This guy made no independent investigation that would have established probable cause. I think that violates the standard under both the federal and Iowa constitution. And I would tell you, the only thing I need to do to win this case is to get the jury to believe precisely what Mr. Mitchell said to me in deposition when I first asked him if there was probable cause to file the sex abuse charge and he said, I don't know that I can say that. I can say that I contacted the county attorney, the county attorney told me to file the charges and I did. Now, if that doesn't overcome summary judgment, I don't know what could. I just got to get him to a jury to believe that the first thing he blurted out of his mouth was the truth. I want to ask, I want to get back to Judge Kelly's line of questioning. Why shouldn't we, and I'm going to follow this up with why. Why shouldn't we, if we get to the Iowa constitutional question, why shouldn't we just certify this to the Iowa Supreme Court? Because it's already been answered by Baldwin, it's a reasonable standard. I'm not sure about that and I'll tell you why. Because this sets up a standard that I don't think Iowa could have possibly intended. Because you have the misfeasance cases where if an officer puts falsehoods in there, it requires knowing or recklessness. That's the Christensen case. And then you now have non-feasance, or in other words, the failure to do something, the failure to do extra stuff, and that's negligence. It makes no sense to require recklessness for misfeasance, but negligence for non-feasance. And so, I'm not sure that the Iowa Supreme Court has fully reconciled its case law. I don't think they want to make a standard that's completely, makes no sense. Well, I would suggest to you that Baldwin has been widely accepted, whether it makes sense to you or not, I can't discuss. But I can tell you, I don't think the Iowa Supreme Court is going to reverse itself on Godfrey and Baldwin. We could do certified questions. I've got certified questions on more issues under this standard in the Supreme Court. The brief is actually due today, so I'm going to rush out of here and put final touches on that. I've got 40 seconds left. If you have more questions. Otherwise, I'll reserve a little bit of time so I can at least come up and say bye. Thank you. Ms. Mackle. May it please the court. My name is Shelly Mackle. I'm an attorney for the city of Des Moines and for Detective Terry Mitchell. I think the important threshold question today to start with is whether or not there actually was a constitutional violation and whether there was an arrest without probable cause. We do know that probable cause is not beyond a reasonable doubt kind of burden of proof. It's not a preponderance of the evidence either. It's not about legal minutia. It's about factual and practical considerations. So it is important to look at what Terry Mitchell knew in terms of facts at the time that he swore out his affidavit. He knew that RS had consistently told multiple people, group home staff, the responding officer, the technician that was there gathering evidence about the events of the day, and she did so largely consistently. She had said that Seydoux dropped her off and picked her up for therapy. He also drove her to Walmart and back, and in the vehicle he was holding her hand and rubbing her thigh. That's enough, by the way, for a violation of the statute. She told him that it turned her on. They went to Walmart where she purchased condoms in anticipation of having sex with him, and this was corroborated by the receipt and the actual box of condoms. She used one of those condoms during intercourse as well as oral sex with Mr. Seydoux. This was corroborated by the presence of an open and empty condom wrapper, one gone out of a box of 30, just like she had reported. She then relayed those events later to Officer Mitchell, again, largely consistently. Now in terms of the practical considerations that we give when we look at a probable cause, it's really helpful to hear from Officer Mitchell in his deposition because he answered a lot of these questions reasonably and consistently. When asked about minor inconsistencies in RS's report, he said that that is actually normal and it's to be expected. He says that after people have some time, they rethink it, they relive it, there are going to be a little bit of differences in their account. He not only said that that's normal and expected, but he said in his experience, that is actually an indicia of authenticity. That when you have someone who's reading a script, essentially, that that's actually more concerning in terms of reliability. I was going to say, what about the big red flags? For example, her giggling during the interview, the fact that she, I don't remember if she's hypersexual or something like that, she's known to lie, all of these things he could have found out. What do we do with all that? Okay. Well, let me pick those apart a little bit. So the first question of does she lie, it's important to know what she lied about because what she would lie about is getting out of the house. That was the big lie. She would manipulate to get out of the house so that she could have sex. She doesn't lie about having sex. Nobody has suggested that. In fact, she tells the truth about having sex. She goes out, she has sex, she breaks the rules to do it, then she comes back, she feels bad and she tells on herself, which is exactly what she did here, except she didn't have to elope. It happened in her own home. That is one of those red flags that comes up. I'm sorry. Well, there are some other things, which is she's hypersexual. She giggled or laughed during recounting the incident. Right. Well, and again, what Terry Mitchell knew at the time, there's a Supreme Court case out there that says if it's not in the report, it didn't happen. That wasn't in Officer Ung's report. There would be no indication to him that her demeanor was off. However, he actually says at his deposition, that's not necessarily off. For somebody who's gone through sexual assault, that's what he investigates. That's his practical experience. He says, being embarrassed, being uncomfortable, sometimes people laugh and giggle when they're uncomfortable. So there isn't a special way that victims are supposed to act. He explained that very clearly in his deposition, that just because, even if he had known that she had laughed, that wouldn't necessarily have made him be concerned about it. It could well have led him to some other questions. But since he didn't know that at the time of swearing out the affidavit, it just wasn't available to him. And part of the problem, I think, at least the argument is, that there was such a stretch of time, your position may take on a different flavor if you're talking about rushing to, or relatively rushing to, the court to get a warrant for whatever reason that you feel you need to act quickly. But wasn't, I think there were about three months in between the time of the incident and the time that the arrest warrant came out. So it seems like not only are there the concerns about demeanor and some of her personal characteristics, but also just physical evidence that could have been followed up on. And either it's there or it's not. And it's relevant to the credibility of the entire story. Why isn't that part of the analysis? That delay in time where really, as I understand it, nothing happened. It's relevant, and again, because of some of the practicality and the issues that Terry Mitchell brings to this process. He's an experienced officer. So one of the things that he said is the fingerprints, okay, so why didn't we send the fingerprints in? He said, well, because I'm aware this isn't TV, it's real life, and fingerprints are actually extremely difficult to get. And especially when you have something like a foil condom wrapper, which this was. So he didn't think they were going to get the fingerprints. When they actually sent it off, he was correct. They didn't get fingerprints. The SANE exam happened before he was even assigned to the case. That happened the same night of the report. And so there were a lot of arguments about why didn't he demand that her mouth be swabbed? Well, he didn't have anything to do with the SANE exam. That happened at the hospital with the victim and the SANE nurse, not with Detective Mitchell there. So by the time he was involved three days later, having her mouth swabbed is not going to be, presumably, it's not going to be particularly helpful. But what he said about the SANE exam also is that he wore a condom. And so it's not likely that there's going to be any semen. And he turned out to be right about that as well. What about the bedsheets? Wasn't there a question about testing the bedsheets? There was. This, you know, DNA, could they get DNA off of the bedsheets? And his concern about that was, this is a group home. Everybody is in and out of here, including the employees. So that was also not likely to lead to a particularly helpful set of information, whatever came out of it, if there was both of their DNA, if there were 10 people's DNA on there. So again, these are these practical considerations that are extremely important when we look at probable cause. And so he made these decisions, not because he was trying to ignore evidence, but because he believed that given the facts that he was presented, that these were not going to be particularly helpful tests to go through. And that was corroborated when the SANE exam and the fingerprint came back. He still believed that at that time, that probable cause was present. And so did the county attorney. And that is, I think, one of the biggest issues in terms of the practicalities of probable cause here, is that he did go to the county attorneys and he said, this is what I think. I think I have probable cause. What do you think? And they both, two of them, said, yes, that's enough. Let's go ahead and write up this affidavit and send it in. And so one of the other practicalities... Excuse me a second. The county attorney signs the application, he signs the affidavit, right? Correct. Okay. One of the other practicalities, we've heard a lot about this, is that RS is mentally ill. And that inherently makes her unreliable, according to Mr. Seydoux's arguments. It's true, her mental illness creates an unstable mood. She is at times combative with staff. There apparently were times where she says that she had heard voices. But that's why Detective Mitchell tested her for lucidity. And he said so in his deposition. He went into that interview with her and he started by asking some kind of basic background questions to see if she was going to track with him. And then he also challenged her a little bit, because she had said, I don't want to be in this group home anymore. It's got too many rules. I don't like it. And so I want to be someplace with a little more independence. But then she said, I also need some one-on-one attention. I need a lot of one-on-one attention. And he said, how can those two things go together? And she explained very logically. She said, no, I can't manage my money and I can't cook. So I need help with things like that. But I don't need all these rules. And she said, I don't need all this drama that's created here in this group setting. What about the difference between the Iowa claim and the federal claim? What is your position on the way the district court handled the Iowa claim, particularly post-Baldwin? Well, I think that this idea that the certified question wiped out all of the jurisprudence on probable cause in Iowa is taking that decision too far. When we're still looking at probable cause, we need to still look at the body of law in Iowa about probable cause. But what is really interesting is that the court that asked for the certified question in the Northern District, Judge Bennett has since applied this new standard, as he called it, a newly minted standard. And he went deep, deep into the Baldwin case. He just really went there. But it's actually illuminating that it's very helpful, even though it's not controlling on this court. What Judge Bennett found by parsing that Baldwin decision was that there is a difference when Iowa is looking at probable cause for purposes of exclusion as compared to when it's looking at probable cause for purposes of damages. And what he found specifically was that there were several places in the Baldwin decision that created something a little different than just negligence. And what he said is, he quoted from Baldwin, that was quoting the Klein case at that point, and it said, good faith may be irrelevant to exclusion, but it is relevant to the issue of damages. So meaning it's relevant to whether a person can recover against an officer. He also said, and quoted Baldwin, that factual good faith may compensate for a legal error. So again, if there's a constitutional violation, a good faith belief from the officer may shield him from damages. The district court also found references in the Baldwin decision that a lack of due care required fraud, malice, or corruption to be present. And in this case, the record doesn't demonstrate any kind of malice, corruption to be present with Detective Bennett. Well, here's the problem I have. And I took a deep dive into Baldwin itself. I didn't take a deep dive necessarily into all of the case law. But the lower court, as I recall in the Baldwin case, or the district court, the federal district court, found that it was a validly issued warrant, even though it didn't charge an offense. And that was up before the Iowa Supreme Court. And the Iowa Supreme Court only said that the district court found that it was a validly issued warrant. And if it's true that good faith would have absolved the defendant in that case of any liability, why didn't the Iowa Supreme Court address that at all? Because it would have totally resolved the entire case. It would have. But they've been very reticent to go any further than issuing the very, very narrow question that they've been asked. And I think we all would have liked it if they had provided some additional contours because unfortunately, I think we're going to have a number of certified questions going up and testing what this means. So you think it's a matter of judicial restraint, not that the Iowa Supreme Court would say that good faith doesn't matter either for exclusionary cases under the criminal, in the criminal realm, or for damages? I don't think that that's what they would say. I think they would say that their, I think the opinion in Baldwin indicates that good faith makes a difference when it comes to immunity and damages, not for exclusionary purposes. And of course, the fact that they didn't address the validly issued warrant makes my question to opposing counsel particularly important about certification. Because if they didn't assume that it was validly issued like the district court did, they may very well have a recklessness or higher standard for a validly issued warrant, even if they don't rely on the good faith rule. So it's kind of a mess, really. It is a mess, I would agree. Can I ask what your view of the district court's handling of it? I agree, it's difficult. But what's your view of how the district court handled it? What standard it applied and whether that is correct, reversible? I believe that the district court relied on the only jurisprudence that's available in Iowa on probable cause. And yet also blended and acknowledged that we have a due care issue, which is necessary. So we have this new standard, but we also have all of this jurisprudence that has to work together. So I believe that the judge was correct. And I believe that what Judge Bennett then went a little bit further to do is to find that there is a heightened standard. It isn't just negligence. It's not been particularly well articulated, but I believe that the district court also hooked into that and understood that it's something a little bit higher than negligence. It does require some level of, as was stated, some level of corruption, some level of fraud, some level of some kind of malice or bad act. And so, and because there isn't any evidence of that in this case, I think it's clear for us that Officer Mitchell is entitled to immunity under both the federal and state constitutions. But again, we strongly assert that there is probable cause in this case. And so the court could actually make a decision based solely on that ground. Last thing, there are some concerning messages in Seydoux's brief, and some of those messages are things like people of mental illness shouldn't be believed and women who like to have sex can't be trusted. And so those kind of notions are archaic. They don't have any place in a 21st century courtroom, and for that reason, the case should be affirmed as well. Thank you. Can I ask you one real quick question? Sure. Mr. O'Brien alluded to the fact, to the possibility that there are some cases currently pending in the Iowa Supreme Court that may elucidate these issues. Are you aware of any specific cases that might be coming down the pike within the next few months, so to speak, that would give us any guidance? I do not know. As Mr. O'Brien said, there were a couple of cases that came down, but they just didn't squarely deal with what this immunity meant. And of course, we have a new composition on the court as well, and so it's kind of hard to tell where it will go. Thank you. Just a couple of points. One, I don't think that if you tell a lie to someone, to more than one person, the second person you tell the lie to does not become proof of the truth of that lie. So the fact that she told this lie to a couple different people still means it all comes from her. Let's just briefly talk about Baldwin. You have to remember that Judge Bennett had granted summary judgment in favor of the plaintiff in Baldwin. They filed the claim under a statute that didn't exist. Then after the Baldwin case came back, that's when he went through his other analysis, and the argument in that case the defense was making was the fact that we had a warrant at least means there's a fact issue as to whether we violated his rights, and Judge Bennett rejected that. So that Baldwin wasn't about whether my case gets thrown out. It was about whether I get summary judgment. If you want to certify questions, you can, but why don't we wait until we have a trial, and then by that time we'll have more facts from Iowa Supreme Court. We've generated a facts issue here. This discussion proves it, so let us have a trial, and then we'll see if the judge gets the jury instructions right, and we'll go from there. My question is this, which is that's exactly what concerns me about Baldwin. You identified it, and why I think there's an open question here, which is that really wasn't a validly issued warrant. If you charge a crime, if you charge something that doesn't exist, didn't exist anymore, that particular crime, that's not a valid warrant, and so isn't it an open question as to how the Iowa Supreme Court would treat a civil claim of damages on a validly issued warrant like this one? Well, I think they assumed it was valid because that's the facts they were given under the rules for certification. So I don't think you can ask that question, and I understand why you're asking it, but again, I don't think it gets us past where we're at. We created a fact issue here on whether he acted reasonably under the Iowa Constitution and the federal constitution. We ought to have a trial. Some of this stuff is going to sort its way out, and we'll get a chance to resolve it at the end. Thank you. Thank you. Thank you to counsel for your argument and your briefing, and I will take the matter into consideration.